RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 08a0127p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ROSALYN GRACE,

*Plaintiff-Appellant,*

*v.*

No. 06-2509

USCAR and BARTECH TECHNICAL SERVICES, LLC,

*Defendants-Appellees.*

>

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 05-72847—Nancy G. Edmunds, District Judge.

Argued: January 31, 2008

Decided and Filed: March 26, 2008

Before: MERRITT, GILMAN, and COOK, Circuit Judges.

---

## COUNSEL

---

**ARGUED:** Darcie R. Brault, DIB, FAGAN AND BRAULT, P.C., Royal Oak, Michigan, for Appellant. Thomas G. Kienbaum, KIENBAUM, OPPERWALL, HARDY & PELTON, Birmingham, Michigan, Melanie T. LaFave, JAFFE, RAITT, HEUER & WEISS, P.C., Southfield, Michigan, for Appellees. **ON BRIEF:** Darcie R. Brault, DIB, FAGAN AND BRAULT, P.C., Royal Oak, Michigan, for Appellant. Jay C. Boger, KIENBAUM, OPPERWALL, HARDY & PELTON, Birmingham, Michigan, Melanie T. LaFave, JAFFE, RAITT, HEUER & WEISS, P.C., Southfield, Michigan, for Appellees. Gary A. Reeve, KENNEDY, REEVE & KNOLL, Columbus, Ohio, for Amicus Curiae.

---

## OPINION

---

## I.

MERRITT, Circuit Judge. The plaintiff, Rosalyn Grace, appeals the district court's order of summary judgment resulting in the dismissal of her Family Medical Leave Act (FMLA) and federal and state gender discrimination claims against defendants USCAR and Bartech Technical Services, LLC (Bartech). First, she argues that Bartech and USCAR are joint employers and thus both liable for violations of her rights under the FMLA. In support of this argument, she contends

that the district court misinterpreted existing case law regarding successor-in-interest liability under the FMLA and that she was eligible for unpaid medical leave. Second, she contends that the district court erred by granting the defendants' motion for summary judgment on her Title VII gender discrimination claim. Specifically, Grace argues that Bartech had sufficient notice of USCAR's violations to be held liable as a joint employer. And finally, the plaintiff argues that her related state-law claims should have been dismissed without prejudice, instead of with prejudice.

We hold that Bartech and USCAR are joint employers for FMLA purposes and that Grace was eligible for unpaid leave. Grace has raised a genuine issue of material fact as to whether the defendants violated her rights under the FMLA; consequently, the district court's grant of summary judgment is reversed as to the plaintiff's FMLA claims. We agree, however, with the district court that the defendants are entitled to summary judgment on the merits of her gender discrimination claims under Title VII. Finally, the plaintiff is mistaken in stating that her state-law gender discrimination claim was dismissed with prejudice; it was not.

## II.

The plaintiff, Rosalyn Grace, held several information technology ("IT") positions for defendant USCAR for eight years, beginning in 1996. USCAR is a general partnership formed between Ford Motor Company, DaimlerChrysler Corporation and General Motors Corporation, which was created to facilitate research and development ("R&D") programs that benefit the U.S. automotive industry.[1] All of USCAR's employees are either contractors, like Grace, who are hired from staffing agencies[2] or full-time employees of one of the partner companies on loan to USCAR.

At all times during her service to USCAR, Grace was a contract employee employed by agencies providing workers for USCAR. During the course of her employment, USCAR used various contracting houses, but most importantly DGE and Bartech.[3] In December 2003, DGE filed for bankruptcy reorganization, at which time USCAR interviewed four companies about assuming the DGE contracts for USCAR's administrative employees, including Grace. Bartech was selected and began to service the USCAR account in January 2004. The plaintiff was employed continuously since 1996 and her duties stayed the same throughout her move from one placement agency to another. Joint Appendix ("JA") 674.

During the time period in question, USCAR's Executive Director was Patricia Flaherty. Grace reported directly to Flaherty and to USCAR's Director of Operations, Michael Martin. Jennifer Shimon, with whom Grace communicated frequently, was the Bartech Account Manager for the USCAR account. Grace developed a respiratory disability (asthma) during the fall of 2004 that eventually resulted in her hospitalization from November 17-26, 2004. As a result, she was unable to continue her IT work at USCAR, and took leave from her position, with an expected return date of January 3, 2005. Grace contacted Bartech with regard to her request for FMLA leave. JA 171. On December 30, 2004, Bartech informed Grace that USCAR had decided to outsource its IT duties and that, as a result, her position was terminated. The plaintiff's recovery took longer than initially expected, and upon notifying the defendants that she was cleared to return to work in February 2005, the defendants again told Grace that her position had been eliminated and that no position remained for her.

---

[1] The 1984 Cooperative Research Act allows competitors, subject to regulations, to work collaboratively on pre-competitive research and development.

[2] In this opinion we refer to Bartech as both a "placement" agency and a "staffing" agency.

[3] In her deposition, the plaintiff indicates that she was first employed by a group "RST," which then merged with "ASG." Thereafter, she was given the opportunity to switch to DGE, which she did. JA 933.

The defendants assert that USCAR management decided in the fall of 2004 to restructure its IT division. As part of this process, USCAR's management team considered switching from using full-time contractors from agencies such as Bartech to contracting directly with individual providers of services on an as-needed basis. JA 90. One such position allegedly targeted for change was the IT Manager position held by Grace. On December 13, 2004, Flaherty recommended, and USCAR approved, the elimination of the plaintiff's full-time position in favor of hiring an ostensibly part-time consultant. JA 93-94. Also in December 2004, USCAR decided to use the services of another Bartech contractor, Brian Spolarich, to handle the regular IT maintenance issues due to Grace's absence. JA 93. In May 2005, Martin decided to contract directly with Spolarich – for a 20 hour per week job – to permanently fill the new IT position at USCAR. JA 733-35.[4]

The plaintiff contends that the reorganization was merely a pretext for USCAR's unlawful behavior towards her. The plaintiff also asserts that Spolarich was working an additional ten to fifteen hours per week developing a database application for an affiliate of USCAR. Furthermore, USCAR was paying Spolarich either $ 62 or $ 75 per hour, while the billing rate USCAR paid to Bartech for the plaintiff's services was $ 58.66. JA 685. Grace argues that when the additional hours and the higher rates paid to Spolarich are included, the defendants would not be saving money compared to her full-time position; according to the plaintiff, therefore, the two positions should be considered as equivalent.

The plaintiff brought suit in federal district court, alleging: (1) violations of the FMLA for failing to return the plaintiff to her pre-leave (or comparable) position and for retaliation,[5] (2) unlawful gender discrimination under Title VII of the Civil Rights Act for replacing her with a lesser qualified male employee and for creating a hostile work environment, and (3) unlawful gender discrimination under Michigan's Elliot-Larsen Civil Rights Act (ELCRA) for the same reasons. The gender discrimination claims were rooted in a joint employment theory, which would make Bartech liable for the actions of the co-employer, USCAR.

Both defendants filed motions for summary judgment on June 1, 2006, which the district court granted. Grace argues that the district court made four mistakes: (1) that it misinterpreted this Court's holding in *Cobb v. Contract Transport, Inc*, 452 F.3d 543 (6th Cir. 2006) when it found that Bartech was not a successor in interest to DGE; (2) that it mistakenly determined that USCAR was not an "employer" under FMLA or Title VII; (3) that the district court erred by requiring the plaintiff to point to specific language putting Bartech on notice of the gender discrimination; and (4) that, in declining to exercise supplemental jurisdiction, the district court should have dismissed Grace's state law claim without prejudice. The effect of the district court's decision is to deny FMLA coverage to an individual who worked as a loaned employee for the same employer (USCAR) for eight years.

**III.**

This Court reviews *de novo* a district court's grant of summary judgment for a party. *Nat'l Solid Wastes Mgm't Ass'n v. Daviess County*, 434 F.3d 898, 902 (6th Cir. 2006). Summary judgment is appropriate where the pleadings and evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. FED. R. CIV.

---

[4] By this time, Flaherty had left her position with USCAR; thus, she did not participate in the final decision to hire Spolarich on a permanent basis. JA 95.

[5] The plaintiff originally pled FMLA retaliation. However, at the summary judgment stage, she admitted she was not claiming retaliation, but instead that the defendants interfered with her FMLA rights by failing to restore her position following leave (*i.e.* an entitlement claim). JA 1223. We therefore address only the entitlement claim.

P. 56(c).  In evaluating the motion, we view all facts and inferences in the light most favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

### IV.

The FMLA was enacted, in part, "to balance the demands of the workplace with the needs of families . . . in a manner that accommodates the legitimate interests of employers . . . ."  29 U.S.C. § 2601(b).  An "eligible" employee may take up to 12 weeks of unpaid leave for certain situations, including a serious medical condition such as asthma.  *See* 29 U.S.C. § 2612(a)(1).  In order to qualify as an eligible employee, an individual must have worked for at least 12 months – and at least 1,250 hours during the previous 12-month period – for a covered employer.  29 U.S.C. § 2611(2).  A covered "employer," in turn, comprises "any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees [within 75 miles of the worksite] for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year."  29 U.S.C. § 2611(4).[6]  The term "employer" also includes "any *successor in interest of an employer*."  29 U.S.C. § 2611(2)(A)(ii)(II) (emphasis added).  The act forbids a covered employer from interfering with the exercise of the right to unpaid leave and furthermore provides that, upon return from leave, an employee must be restored to the same or similar position unless the employer offers sufficient economic justification for the elimination of the position.  *See* 29 U.S.C. § 2614.

Grace contends that USCAR and Bartech are joint employers and that both are liable for violating her FMLA rights by failing to restore her to her pre-leave, or equivalent, position.  The district court granted summary judgment for both defendants.  *Grace v. USCAR*, No. 05-72847, 2006 U.S. Dist. LEXIS 72311 (E.D. Mich. Oct 4, 2006).  It first determined that USCAR was not an employer for FMLA purposes because it did not have any employees on its books, thereby precluding a finding that the entity satisfied the numerosity requirement.  *Id.* at *21.  Furthermore, it held that USCAR's liability as a secondary employer under the statute was derivative of Bartech.  *Id.* at *20.  In addressing Bartech's potential liability, the district court concluded that even though Bartech employed 50 or more employees, Grace was ineligible for FMLA leave because she failed to satisfy the requisite 12-month qualification period (in fact, Bartech had been her employer for 11 months).  *Id.* at *18-19.  In reaching the conclusion that Grace did not qualify as an eligible employee *vis-à-vis* Bartech, the district court rejected the plaintiff's argument that Bartech should be considered a successor in interest to Grace's prior placement agency employer, DGE.  Under a successor-in-interest theory, the time Grace was employed by DGE would be tacked on to her 11 months with Bartech, thereby satisfying the 12-month qualification period.  *See generally Cobb v. Contract Transp., Inc.*, 452 F.3d 543 (6th Cir. 2006).

This case does not present a simple scenario where an easily identifiable employer-employee relationship exists.  In such a case, it is usually just an issue of crunching the numbers – Does the employer have more than 50 employees within 75 miles of its worksite?  Has the employee worked for more than 12 months and for 1,250 hours during that time? – to determine whether the individual employee is entitled to FMLA unpaid medical leave.  Rather, the case presents the increasingly common and often complex situation where two entities – a staffing agency and client employer – exercise some level of joint control over a common employee.[7]  Correctly describing the nature of

---

[6] As discussed *infra*, a secondary employer in a joint employment relationship need not satisfy the numerosity requirement (*i.e.* 50 or more employees).

[7] The United States Bureau of Labor Statistics periodically compiles statistics of contingent and alternative employment arrangements.  In February 2005, there were 10.3 million independent contractors (7.4 percent of total employment), 2.5 million on-call workers (1.8 percent of total employment), 1.2 million temporary help agency workers (0.9 percent of total employment), and 813,000 workers provided by contract firms (0.6 percent of total employment).

Bartech's and USCAR's relationship with Grace, and the attendant ramifications under the FMLA, presents an important first step in resolving this case, one for which little precedent exists.

The FMLA itself is silent about the issue of joint employment. *See, e.g., Moreau v. Air France*, 343 F.3d 1179, 1182 (9th Cir. 2003) (noting that the FMLA "does not contain any language specifically addressing the joint employment concept"). But in the FMLA, Congress specifically instructs the Department of Labor to "prescribe such regulations as are necessary to carry out" the statute's intent. 29 U.S.C. § 2654; *see also Chevron v. Natural Resources Defense Council*, 467 U.S. 837 (1984) (describing how judicial deference to an agency interpretation is appropriate where the statute is silent or ambiguous and the interpretation is reasonable). The resulting regulations contemplate two possibilities for framing employment relationships such as the one that exists between USCAR and Bartech: (1) the "integrated employer test," and (2) the "joint employment" test. 29 C.F.R. § 825.104(c)(1).[8] Courts have consistently applied the Department of Labor regulations when addressing questions about FMLA leave. *See, e.g.*, *Cobb*, 452 F.3d at 551 (6th Cir. 2006) (deferring to the Department of Labor's regulations addressing the issue of successor in interest, discussed *infra*); *Engelhardt v. S.P. Richards Co.*, 472 F.3d 1 (1st Cir. 2006); *Stierl v. Ryan Alternative Staffing, Inc.*, No. 4:06CV1751, 2007 U.S. Dist. LEXIS 32710, *13 (N.D. Ohio May 3, 2007) ("Furthermore, the Court finds that 29 C.F.R. § 825.106 [addressing joint employment] is entitled to deference, given that it is consistent with the FMLA and necessary to carry out its purposes."); *Schubert v. Bethesda Health Care Group, Inc.*, 319 F. Supp. 2d 963, 969 (E.D. Mo. 2004) ("What defendants fail to recognize is that the regulations require consideration of all four [integrated employment test] factors . . . [which are] entitled to deference"); *but see Harbert v. Healthcare Servs. Group, Inc.*, 391 F.3d 1140 (10th Cir. 2004) (refusing to give deference to a regulation concerning what locality constituted the "worksite" where the agency's interpretation was manifestly contrary to the FMLA). Giving deference to an agency's reasonable interpretation of a statute accords with Congress' intent to delegate rulemaking to agencies and also promotes "uniformity in . . . administrative and judicial understandings of what a national law requires." *Aeroquip-Vickers, Inc. v. Comm'r*, 347 F.3d 173, 180 (6th Cir. 2003) (citing *United States v. Mead Corp.*, 533 U.S. 218, 226-27, 234 (2001)).

We discuss in turn the integrated employers test and the joint employer test.

### *(A) The "integrated employers" test*

According to the integrated employment theory elaborated by the Department of Labor, "[s]eparate entities will be deemed to be parts of a single employer for purposes of FMLA." 29 C.F.R. § 825.104(c)(2). The regulations provide the following four factors for helping to determine if two entities should be treated as an integrated employer: (1) common management,

---

According to the definition provided by the Bureau of Labor Statistics, Grace would be included as a worker provided by a contract firm: "Workers who are employed by a company that provides them or their services to others under contract and who are usually assigned to only one customer and usually work at the customer's worksite." *See* Press Release, Bureau of Labor Statics, Contingent and Alternative Employment Arrangements, February 2005 (July 27, 2005), *available at* http://www.bls.gov/news.release/conemp.nr0.htm.

[8] The Second Circuit described the fundamental difference between the two tests as follows:

> The difference between the "joint employer" and the "integrated employer" tests *turns on whether the plaintiff seeks to impose liability on her legal employer or another entity*. *Compare* 29 C.F.R. § 825.106 *with* § 825.104(c)(2). The former looks to whether there are sufficient indicia of an employer/employee relationship to justify imposing liability on the plaintiff's non-legal [i.e. secondary] employer. The latter applies where . . . liability is sought to be imposed on the legal employer by arguing that another entity is sufficiently related such that its actions, or in this case, size, can be attributable to the legal employer.

*Engelhardt v. S.P. Richards Co.*, 472 F.3d 1, 4 n.2 (2d Cir. 2006) (citations omitted) (emphasis added).

(2) interrelation between operations, (3) centralized control of labor relations, and (4) degree of common ownership/financial control. 29 C.F.R. § 825.104(c)(2)(i-iv). Accordingly, the factors seek to illuminate whether two putatively distinct businesses should be viewed as one corporate entity. "Where this test is met, the employees of all entities making up the integrated employer will be counted in determining employer coverage and employee eligibility." 29 C.F.R. § 825.104(c)(2). Thus, the integrated employer test is a mechanism to ensure that the appropriate employees are aggregated for the numerosity test of the FMLA. As the First Circuit describes, the test appreciates that small businesses – *i.e.* those with less than 50 employees – are not subject to the FMLA's "onerous requirement of keeping an unproductive employee on the payroll," while simultaneously preventing companies from structuring their business to avoid labor laws. *Engelhardt*, 472 F.3d at 6.

Limited case law applying the integrated employer test exists, but other circuits that have addressed the issue have generally found that the test was not met. *See, e.g.*, *Engelhardt*, 472 F.3d 1 (finding that a wholly-owned subsidiary and the parent were not integrated employers); *Morrison v. Magic Carpet Aviation*, 383 F.3d 1253, 1257 (11th Cir. 2004) ("As a matter of law, we do not believe that common ownership of two corporations is enough for a jury to conclude that there were integrated into one operation for FMLA purposes."); *see also Arculeo v. On-Site Sales & Mktg., L.L.C.*, 425 F.3d 193, 196 (2d Cir. 2005) (finding no integrated employment for the purposes of Title VII); *but see Schubert*, 319 F. Supp. 2d 963 (finding sufficient evidence of integrated employment where two putatively distinct health care companies had the same officers, nearly identical officers, similar corporate purpose, and principal place of business at the same address). The First Circuit's *Engelhardt* decision is particularly instructive.

In *Engelhardt*, an individual appealed the district court's determination that she was not an employee under the FMLA because her employer did not satisfy FMLA's numerosity requirement. The plaintiff worked for S.P. Richards Co. (SPR), a wholly-owned subsidiary of Genuine Parts Co. (GPC). On appeal, the plaintiff argued that SPR and GPC were integrated employers and that, together, they satisfied the FMLA numerosity requirement. In support of her claim, the plaintiff offered, *inter alia*, the following evidence: that SPR adopted many of GPC's personnel policies, that many of SPR's personnel-related documents carried the GPC letterhead or logo, and that GPC issued SPR's payroll checks. *Engelhardt*, 472 F.3d at 2-3. In concluding that this "arm's length" relationship did not constitute integrated employment for purposes of the FMLA, the *Engelhardt* Court focused on the fact that none of the four enumerated factors supported the plaintiff's argument. *Id*. at 8. First, the court noted that there was no evidence suggesting that the two companies were under the same management. *Id*. at 6. Second, the operations of the two entities were not interrelated, for the two maintained separate headquarters, human resource departments, records, and worksites; additionally, the court noted that the nature of the businesses (office-supply vs. car parts) was different. *Id*. at 7. Applying the third factor – centralized control of labor relations – the court found that the two entities each made independent decisions with respect to labor relation (*e.g.* only SPR had the power to determine the number of employees it needed). *Id*. And finally, the opinion reasoned that the overlap in administrative services was irrelevant to the fourth factor, the degree of common ownership and financial control. *Id.* at 7-8.

In the instant case the integrated employer framework is similarly inapposite. Under the first factor, there is no evidence of common management – at least insofar as the core responsibilities and operations of each business – between USCAR and Bartech. Although the two companies certainly had a shared relationship with Grace, USCAR did not oversee any of Bartech's corporate decision or facilities, or *vice versa*. *But see Armbruster v. Quinn*, 711 F.2d 1332, 1339 (6th Cir. 1983) (finding at least some evidence of common management where one person was the president of one entity and the director of another in a Title VII integrated employer case). The second prong, whether the entities have interrelated operations, militates even more strongly against a finding of integrated employment in this case. USCAR and Bartech maintain separate offices; moreover, the nature of the work is completely different: one is dedicated to research and design for the car

industry while the other is a staffing agency. At first blush, the third factor – centralized control of labor relations – appears more favorable to a finding that USCAR and Bartech are integrated employers. For example, Grace reported directly to Flaherty (at USCAR), but also maintained a close relationship with Shimon at Bartech. But the mere fact that two entities both communicated with a single employee does not mean that their employment relations, *as a whole*, are interrelated, as the regulations contemplate. Indeed, USCAR made its own decisions with regards to securing an additional employee to replace Grace and to restructuring its IT department. The fact that it asked Bartech to provide an additional employee does not indicate that Bartech exercised any control over this employment decision. Nor, obviously, did USCAR have any influence on Bartech's decision to loan employees to other client employers. And finally, no evidence exists that the two entities were subject to common ownership or financial control. Because none of the four factors are met, the interrelated employer test is inapplicable.

### (B) The "joint employers" test

The regulations promulgated by the Department of Labor interpreting the FMLA also elaborate a test for joint employment under the Act. At its core, joint employment encompasses situations where "two or more businesses exercise some control over the work or working conditions of the employee." 29 C.F.R. § 825.106(a). "In a joint employer relationship the analysis assumes separate legal entities exist but that they have chosen to handle certain aspects of their employer-employee relationships jointly." *Schubert v. Bethesda Health Group, Inc.*, 319 F. Supp. 2d 963, 970 (E.D. Mo. 2004) (citing *NLRB v. Browning-Ferris Indus. of Penn., Inc.*, 691 F.2d 1117, 1122 (3d Cir. 1982). Unlike integrated employers, which are treated as a single legal entity, joint employers "may be separate and distinct entities with separate owners, managers, and facilities." 29 C.F.R. § 825.106(a). The regulations describe three employment relationships where joint employment will "*generally . . . be considered to exist*":

> (1) Where there is an arrangement between employers to share an employee's services or to interchange employees;
> (2) *Where one employer acts directly or indirectly in the interest of the other employer in relation to the employee*; or,
> (3) Where the employers are not completely disassociated with respect to the employee's employment and may be deemed to share control of the employee, directly or indirectly, because one employer controls, is controlled by, or is under common control with the other employer.

29 C.F.R. § 825.106(a) (emphasis added). The second situation – in which one employer acts in the interest of another – describes the situation in the instant case: Bartech, a staffing agency responsible for providing specialized technical staff, is acting in USCAR's interests by managing Grace and ensuring that USCAR's staffing needs for its IT division are met. Furthermore, the regulations specifically state that "*joint employment will ordinarily be found to exist when a temporary or leasing agency supplies employees to a second employer.*" 29 C.F.R. § 825.106(b) (emphasis added). Thus, the language from the Department of Labor's regulations indicates that Bartech and USCAR are joint employers. The district court agreed, finding that Bartech and USCAR were joint employers under the FMLA: "[T]he FMLA regulations state that USCAR qualifies as a secondary employer because it contracted for Plaintiff's services through Bartech . . . ." *Grace*, 2006 U.S. Dist. LEXIS 72311 at *20-21.

Limited case law addressing the issue of joint employment under the FMLA exists.[9]  *See*, *e.g.*, *Moreau v. Air France*, 356 F.3d 942 (9th Cir. 2004);  *Mahoney v. Nokia*, 444 F. Supp. 2d 1246 (N.D. Fla. 2006), *aff'd* 236 Fed. Appx. 574 (11th Cir. 2007).  In *Moreau*, Air France contracted with a number of companies, including an agreement with Dynair to provide ground handling services such as ramp and towing assistance, to service its planes at San Francisco International Airport.  356 F.3d at 948.  The plaintiff argued that these relationships constituted joint employment for purposes of FMLA.  In rejecting the plaintiff's argument and finding that no joint employment existed, the Ninth Circuit focused on the fact that Air France did not have the "authority to 'control' any of the workers" of the companies providing the services.  *Id*. at 950.  Air France did not, for example, have the ability to hire or fire Dynair employees or even to determine the salaries of their employees; instead, Air France merely verified that Dynair's work complied with applicable airline regulations.  *Id*. at 950-51.  Conversely, in *Mahoney*, Nokia hired an employee from Spherion Atlantic Workforce to work at its Florida facility.  Spherion managed the plaintiff's benefits and performed all payroll functions for the employees it leased to Nokia; moreover, the plaintiff specifically acknowledged that Spherion was his employer.  *Mahoney*, F. Supp. 2d at 1248.  However, Nokia also exercised considerable control over the employee: it supervised his day-to-day work, fixed his salary, and determined the number of hours that it needed the employee's services.  *Id*. at 1249.  In analyzing the situation as joint employment, the court noted, "Nokia does not appear to contest the fact that joint employment existed" and that the parties had essentially agreed that "a joint employment relationship is assumed by the applicable regulation [29 C.F.R. § 825.106]."  *Id*. at 1254.

We believe that the instant case mirrors that in *Mahoney*.  First, as in *Mahoney* but unlike in *Moreau*, USCAR and Bartech both exercised significant control over Grace.  Bartech performs essentially the same roll as Spherion: it has loaned an employee to a client employer[10] (*i.e.* USCAR vs. Nokia) and manages her payroll and benefits.  Moreover, Grace specifically acknowledges that Bartech is her employer.  JA 47.  Also, as in *Mahoney*, the client employer in the instant case, USCAR, maintained significant control over Grace and did so for eight years, including supervising her day-to-day work and determining her salary and hours.  It is undisputed, for example, that Flaherty, USCAR's Executive Director since January 2003, supervised Grace's everyday work responsibilities.  *See* JA 933-34.  Consequently, both employers exercise some control over Grace. And second, while both parties contest that they are "employers" under the FMLA definition,[11] they effectively concede that a joint employment would otherwise exist.  *See* Br. of Defendant (USCAR) at 34 (discussing how it is not a secondary employer because Grace was not an eligible employee); Br. of Defendant (Bartech) at 2-3 (noting that it employed Grace and assigned her to USCAR). Hence, the joint employment definition elaborated by the Department of Labor provides the appropriate standard for analyzing the plaintiff's claims in the instant case.

### *(C) Bartech's and USCAR's obligations as joint employers*

In order to promote administrative efficiency and to ensure accountability under the FMLA, the Department of Labor regulations addressing joint employment distinguish between the "primary" and "secondary" employer.  For example, "[i]n joint employment relationships, only the primary employer is responsible for giving required notices to its employees, providing FMLA leave, and

---

[9] It may be that in most staffing agency cases the employers have stipulated to the existence of a joint employment relationship. *See, e.g., Stierl v. Ryan Alt. Staffing*, No. 4:06CV1751, 2007 U.S. Dist. LEXIS 32710, *8 (D. Ohio 2007) (the defendant agreed that it had a "joint employment" relationship with the staffing agency as defined by 29 C.F.R. § 825.106).

[10] While Grace's work with USCAR predates her status as a Bartech employee, this does not change the fact that Bartech has loaned her to USCAR.

[11] The defendants' arguments are considered, and rejected, in Parts V and VI, *infra*.

maintenance of health benefits." 29 C.F.R. § 825.106(c). But when an eligible employee takes leave, the regulations ensure that *both* the primary and secondary employers honor the decision and do not engage in retributory action:

> Job restoration is the primary responsibility of the primary employer. The *secondary employer* is responsible *for accepting the employee returning from FMLA leave in place of the replacement employee if the secondary employer continues to utilize an employee from the temporary or leasing agency*, and the agency chooses to place the employee with the secondary employer. A secondary employer is also responsible for compliance with the prohibited acts provisions with respect to its temporary/leased employees, *whether or not the secondary employer is covered by FMLA*. The prohibited acts include prohibitions against interfering with an employee's attempt to exercise rights under the Act, or discharging or discriminating against an employee for opposing a practice which is unlawful under FMLA.

29 C.F.R. § 825.106(e) (emphasis added). Grace alleges that she requested her leave from Bartech, and that both Bartech and USCAR violated the FMLA by failing to reinstate her at the end of her unpaid leave.

In order to determine which employer qualifies as the primary employer, the Department of Labor regulations prescribe the following factors: (1) the authority/responsibility to hire and fire, (2) the ability to assign/place the employee, (3) the employer making payroll, and (4) the employer responsible for providing employment benefits. 29 C.F.R. § 825.106(c). Additionally, the regulations offer a default rule for the majority of cases involving a staffing agency and a client employer: "For employees of temporary help or leasing agencies [such as Bartech] the *placement agency most commonly would be the primary employer*." *Id.* (emphasis added).[12]

The application of these factors leads us to conclude that Bartech is the primary employer. First, as to the question of the ability to hire and fire, both USCAR and Bartech exercise considerable control over Grace. USCAR's decision to restructure its IT department, for example, helped lead to her termination. However, Bartech alone has the ultimate ability to hire and fire Grace. Even after USCAR made the decision to terminate her position, Grace was still an employee of Bartech; indeed, the record indicates that Bartech sought to lease her to another client employer. Conversely, had Bartech chosen to terminate Grace, her employment at USCAR would likely have also ceased *immediately;* in such a situation, USCAR would then need to ask for a replacement from another staffing agency or contract with a replacement directly. Under the second factor, USCAR undoubtedly controlled Grace's day-to-day activities. Again, however, Bartech had the *sole* ability to assign her to another employer. For example, had CanadaCar offered to pay Bartech more for Grace's services, then Bartech could have reassigned her accordingly. And under the final two factors, Bartech is the employer responsible for making Grace's payroll and for managing her benefits. Though it is ultimately USCAR that is providing the resources to pay Grace, Bartech occupies the important legal position of being the entity in charge of her payroll and benefits. Thus,

---

[12]A brief hypothetical reveals the policy considerations underpinning this default designation between primary and secondary employers. Suppose that Jane Smith was hired by Temp Agency in 1998. Over the next ten years, Temp Agency leased Smith to five client companies – A, B, C, D, and E – for two years each. Assume that Smith worked the requisite number of hours at the client companies to qualify as an eligible employee and that all of the employers meet the FMLA numerosity requirement. If a court found that the Temp Agency was the secondary employer – and that each client was the primary employer – Smith would only have FMLA coverage for five of the ten years she was employed by Temp Agency. This is because each time she switched jobs, her FMLA eligibility would reset and would not be restored until 12 months had elapsed (unless a client was a successor in interest to a previous client). By designating the leasing agency as the primary employer, the regulations ensure that Smith is covered for nine of the ten years; that is, she qualifies for FMLA leave after her initial 12-month period and preserves her eligibility regardless of how many times she switches between client employers.

we believe that the default rule, which designates the staffing agency (*i.e.* Bartech) as the primary employer, is applicable in the instant situation. *See Mahoney*, 444 F. Supp. 2d at 1255-56 (applying the § 825.106 factors and determining that the staffing agency was the primary employer in its relationship with its client, Nokia, the secondary employer).

The specific facts of the case reinforce our conclusion that Bartech is the primary employer and that USCAR is the secondary employer. When Grace became ill, she informed Bartech and not USCAR of her intention to take FMLA leave. JA 171. According to the regulations interpreting joint employment under the FMLA, this action was sufficient to trigger potential liability for both because she need only inform her primary employer of her intention to take leave ("only the primary employer is responsible . . . for providing FMLA leave"). 29 C.F.R. § 825.106(c); *see also* 29 U.S.C. § 2611(2)(A)(i) ("an eligible employee means an employee who has been employed – for at least 12 months by the employer with respect *to whom leave is requested*") (emphasis added). Where an employee is eligible for leave, the primary employer is liable for any violations under the FMLA. In addition, the secondary employer is directly liable for both complying with the "prohibited acts provisions" of the FMLA (*e.g.* discriminating against an employer who takes FMLA leave, 29 U.S.C. § 2615(a)(2)) and "accepting the employee returning from FMLA leave in place of the replacement employee if the secondary employer continues to utilize an employee from the temporary or leasing agency." 29 C.F.R. § 825.106(e). As discussed *infra*, USCAR did continue to utilize an employee from the leasing agency; in fact, it specifically requested that Bartech provide a replacement employee to take over Grace's IT responsibilities. Consequently, for purposes of analyzing Grace's FMLA claim, Bartech is the primary employer and USCAR is the secondary employer.

### *(D)  Plaintiff has raised a cognizable claim that her FLMA rights were violated*

It is unlawful for employers to "interfere with, restrain or deny the exercise of or attempt to exercise, any [FMLA] right provided." 29 U.S.C. § 2615(a)(1); *Hoge v. Honda of Am. Mfg.*, 384 F.3d 238, 244 (6th Cir. 2004). Qualifying employees who return to work within the 12-week period of their unpaid medical leave are entitled to be restored to "the position of employment held by the employee when the leave commenced," or "to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1).[13] Grace's allegation of a violation of this right, which we have previously described as the "entitlement" or "interference" theory arising from 29 U.S.C. § 2615(a)(1), is different from a "retaliation" or "discriminatory" theory arising from 29 U.S.C. § 2615(a)(2). *See Hoge*, 384 F.3d at 244. As discussed *supra*, a secondary employer who interferes with an employee's effort to return to her position is also liable under the Act.

To prevail on the entitlement theory claim (*i.e.* failure to reinstate), an employee must prove that: (1) she was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled. *Edgar v. JAC Prods.*, 443 F.3d 501, 507 (6th Cir. 2006). However, "[a]n employee returning from FMLA leave is not entitled to restoration unless he would have continued to be employed if he had not taken FMLA leave." *Hoge*, 384 F.3d at 245.

---

[13] An "equivalent position" under 29 U.S.C. § 2614(a)(1)(B) is:
> [O]ne that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status. It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority.

29 C.F.R. § 825.215(a); *Hoge*, 384 F.3d at 245.

As discussed *infra*, the plaintiff has satisfied the first and third prongs and is an eligible employee *vis-à-vis* Bartech. Additionally, it is undisputed that Bartech employs more than 50 individuals within 75 miles of Grace's worksite and is thus an employer under FMLA. Grace provided sufficient notice to the defendants of her intention to take leave. *See* JA 171 (noting that she informed Bartech of her intent); *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 421 (6th Cir. 2004) (notice must be "reasonably adequate to apprise the employer of the employee's request"). However, Bartech and USCAR contend that the decision to terminate the plaintiff resulted from a legitimate economic decision, thereby precluding the plaintiff from satisfying the fifth prong.

An employer's intent is not directly relevant to the entitlement inquiry. *Edgar*, 443 F.3d at 507. However, "interference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." *Id.* at 508 (citing *Arban v. West Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003) ("An employee lawfully may be dismissed, preventing him from exercising his statutory rights to FMLA leave or reinstatement, but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave.")). If the defendant proffers such a justification, then the plaintiff may seek to rebut it by a preponderance of the evidence. *See Arban*, 345 F.3d at 401. Specifically, a plaintiff can "refute the legitimate, nondiscriminatory reason that an employer offers to justify an adverse employment action 'by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" *Wexler v White's Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003) (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)).

Here, the defendants claim that Grace's termination was the result of USCAR's decision to restructure its IT division, which would have occurred regardless of her having taken leave. *See, e.g.*, JA 226, 254, 261, 346-47 (discussing operational efficiencies and outsourcing). Additionally, the defendants claim that Spolarich, who was hired after Grace left, had different duties and responsibilities, thereby precluding the plaintiff from alleging the requisite harm (*i.e.* that a comparable position existed for Grace to return to). In response, the plaintiff argues that the defendants' argument is pretextual and belied by the facts. As to the issue of restructuring, the plaintiff points to the notes and deposition of Martin (the USCAR Director of Operations) from the meeting in which the decision to terminate Grace was made. After being apprised of the need to have a "legitimate business reason" to avoid the risk of being "sued by Roz [Grace] . . . [who was] out on *disability*," the following question was raised: "*Can lawyers construct a way to make it* [Grace's termination] *doable*?" *See* JA 1314 (notes), JA 849 (deposition) (emphasis added). This statement alone is a smoking gun and raises a genuine issue of material fact, subject to a jury determination, as to whether the restructuring would have occurred had she not taken leave due to her disability. *Cf. Arban*, 345 F.3d at 401. Moreover, the plaintiff argues that Spolarich, who was ostensibly part-time, performed sufficiently comparable work to constitute a full-time position "equivalent to" the one she held prior to taking leave. *See* Br. of Plaintiff at 21 (citing JA 749-750, 729-735); 29 U.S.C. § 2614(a)(1). It is not disputed that Spolarich was compensated at a higher rate than Grace, which would support her theory that his was an equivalent position, at least in terms of the cost to USCAR. Br. of Plaintiff at 21 (citing JA 729-735); *see also* JA 1314 (Martin's notes describing how they could replace plaintiff with a part-time position). Together, these facts raise a genuine issue of material fact. *See also* JA 1226 (where the district court, in the trial record, noted that there appeared to be genuine "factual disputes" in the record). Grace may thus pursue her FMLA entitlement claim.

## V.

Bartech contends that even if it is the primary employer in a joint employment relationship, Grace is not eligible for unpaid leave. Specifically, the company argues that Grace did not satisfy

the 12-month qualification period under 29 U.S.C. § 2611(2)(A)(i).  While Grace had worked for USCAR for eight years, Bartech had only served as Grace's placement agency for 11 months before she took leave to recover from asthma.  The district court agreed with the defendant's argument and dismissed the plaintiff's claim after finding that Grace was not an eligible employee.  *Grace*, 2006 U.S. Dist. LEXIS at *18-19.  On appeal, the plaintiff argues that the district court erred as a matter of law by finding that Bartech was not a "successor in interest" to DGE and that a contrary holding would enable her to qualify as an eligible employee under the FMLA.[14]

An employee becomes eligible under the FMLA after working for a covered employer for at least 12 months. 29 U.S.C. § 2611(2)(A)(i).  The term "employer" includes not only someone who "acts, directly or indirectly, in the interest of the employer to any of the employees of such employer" but also any "successor in interest of an employer."  29 U.S.C. § 2611(4)(A)(ii).  To determine whether an employer qualifies as a successor in interest to a previous employer, FMLA's implementing regulations adopt the framework from Title VII of the Civil Rights Act and the Vietnam Era Veterans' Adjustment Act (VEVAA). 29 C.F.R. § 825.107; *Cobb v. Contract Transp.*, *Inc.*, 452 F.3d 543, 551 (6th Cir. 2006).  The regulations instruct courts to consider the following eight factors in determining whether an employer is a successor in interest:

(1) Substantial continuity of the same business operations;
(2) Use of the same plant;
(3) Continuity of work force;
(4) Similarity of jobs and working conditions;
(5) Similarity of supervisory personnel;
(6) Similarity in machinery, equipment, and production methods;
(7) Similarity of products and services; and
(8) The ability of the predecessor to provide relief.

*Cobb*, 452 F.3d at 551 (quoting 29 C.F.R. § 825.107).  "[W]hether or not a 'successor in interest' exists is not determined by the application of any single criterion, but rather the entire circumstances are to be viewed in their totality."  *Id.*

But the eight factors are "not in themselves the test for successor liability."  *Id.* at 555. Rather, they are factors in an overarching, three-part test considering the *equities* of imposing a particular legal obligation on a successor: (1) the interests of the plaintiff-employee, (2) the interests of the defendant-employer, and (3) the federal policy goals of the statute.  *Id.*[15]

We previously analyzed a similar question of successor liability under FMLA in a decision that carefully traced the Supreme Court's decisions regarding successor liability in the labor law

---

[14]DGE merged with Grace's original staffing agency employer AST.  Although the exact date is unclear, it is not disputed that Grace would meet the eligibility requirement if Bartech were a successor in interest to DGE.  The defendants do, however, appear to argue that the record fails to establish that DGE employed 50 employees, a necessary precondition to being an "employer" for FMLA purposes.  This argument would preclude a finding that Bartech is a successor in interest "of an *employer*." 29 U.S.C. § 2611(4)(A)(ii) (emphasis added).  The plaintiff contends that this issue cannot be raised on appeal.  However, the record does establish that DGE employed at least 50 employees and thus qualifies as an "employer" for FMLA purposes.  *See* JA 991 (DGE had at least 97 employees).

[15]As we recognized in *Cobb*, balancing the equities may result in different conclusions as to whether successor liability may exist for different legal obligations.  452 F.3d at 555.  The relevant factual inquiries may also differ depending on the legal duty at issue.  *Id.* (comparing *Howard Johnson Co. v. Detroit Local Joint Exec. Bd., Hotel & Rest. Employees Int'l Union*, 417 U.S. 249 (1974) (finding that the single most important factor when imposing the duty to arbitrate is whether the new employer employs the same employees), *with Golden State Bottling Co. v. NLRB*, 414 U.S. 168 (1973) (extending successor liability to unfair labor practices, but focusing the inquiry on whether there was a transfer of assets and substantial continuity of the business enterprise)).

context. *See generally Cobb*, 452 F.3d 543. In *Cobb*, the plaintiff, a truck driver employed by Contract Transport (a staffing agency) for a United States Postal Service contract route, was terminated from his position after he had gallbladder surgery. He then filed suit, alleging that the company had violated the FMLA by terminating him for taking his unpaid leave. The federal district court granted the defendant's motion for summary judgment after finding that the defendant was not an "eligible employee" under FMLA because he had worked for the defendant for less than 12 months. *Id.* at 547. In reaching its conclusion, the district court refused to apply successor liability based on the plaintiff's previous employer, for whom he had worked for three years performing the same duties. We reversed, noting that the plaintiff's employment was continuous, that the responsibilities and duties were the same, and that "only the management, not the job, [had] changed." *Id*. at 557.

Here, the district court began its analysis by rejecting Bartech's argument that the plaintiff had failed to meet the "threshold inquiry" of demonstrating that there was a substantial continuation between DGE's and Bartech's operations.[16] *Grace v. USCAR*, 2006 U.S. Dist. LEXIS at *14 (citing *3750 Orange Place Ltd. P'ship v. NLRB*, 333 F.3d 646, 655 (6th Cir. 2003)). It then initiated a discussion of the three-pronged equity test, beginning with the observation that Grace's case was "quite similar to *Cobb*," particularly the fact that the "plaintiff's job responsibilities, location, working conditions and manager *did not change in any fashion. . . .*" *Id*. at *17 (emphasis added). But the district court distinguished *Cobb* based on what it perceived to be one critical factual difference – in *Cobb*, the contract at issue was subject to automatic re-bidding every two years. *Id*. at *18. According to the district court, this automatic re-bidding put employees "at a disadvantage by having their FMLA rights eliminated every two years once a new company won the bid." *Id.* The court also noted that the change in management in the instant case was not the result of a "tactical maneuver," but rather DGE's pending bankruptcy. *Id*. at *19. The district court thus concluded that the equities at play in Grace's situation – which did not include what it perceived to be the critical element of the automatic re-bid provision[17] – weighed against imposing successor liability on Bartech. For the following reasons, we disagree with the district court's analysis and find that Bartech is a successor in interest to DGE. Grace, in turn, was eligible for up to 12 weeks of unpaid leave under the FMLA.

The first prong of the equitable analysis – the employee's interest – supports a finding that Bartech is a successor in interest to DGE. As the district court noted, the regulatory factors enumerated in 29 C.F.R. § 825.107 weigh in the plaintiff's favor. With respect to the USCAR account at issue in the case, the operations did not change after Bartech took over from DGE: Bartech inherited the same work site and substantially the same workforce (five of seven employees). Similarly, the job and working conditions, supervisory personnel, and IT services provided all remained the same. In effect, only the staffing agency's management changed after Bartech choose to take over DGE's former employers.

---

[16]Bartech urged the district court, in an argument it raises again on appeal, to focus on the total percentage of employees it hired from DGE, which comprised less than 2% of Bartech's total workforce. Br. of Defendant (Bartech) at 32. The district court correctly focused its analysis on the fact that Bartech employed five of the seven former DGE employees who were involved in USCAR. *See Grace*, 2006 U.S. Dist. LEXIS at *15 ("If Bartech's reasoning were adopted, then any large entity that absorbed a much smaller company in any fashion would never be considered to be a substantial continuation of the small company. . ."). In addition, when DGE filed for bankruptcy, Bartech received an additional 30 of their contract laborers assigned to DaimlerChrysler. JA 58.

[17]While the USCAR contract was not subject to any automatic re-bidding, it is worth noting that Grace's employer (*i.e.* contract house) changed three times – that is, twice prior to Bartech – during her eight years of employment. Hence, the same problem of her eligibility for leave resetting exists.

While the district court recognized that the regulations supported the plaintiff under the first prong, it purported to distinguish the case from *Cobb* by seizing upon our use of the language "equally important" to describe the relevance of the re-bid contract in *Cobb*. *See Cobb* 452 F.3d at 557 ("Equally important, however, declining to apply successor liability to companies competing for government contracts circumvents implementation of the FMLA."); *Grace*, 2006 U.S. Dist. LEXIS at *17-18 ("[T]he Sixth Circuit also noted that an '*equally important*' *factor* was that the USPS contract at issue was automatically put up for re-bid every two years." ) (emphasis added). The district court thus treated the language "equally important" to mean that the re-bid provision was literally equally important to each of the other eight factors in the first prong of the analysis. A better reading – one that does not result in an amendment to the applicable Department of Labor regulations – is that the language in *Cobb* reinforced the factors favorable to the plaintiff under the first prong and, more importantly, referred to the fact that a finding of successor liability also vindicated the third prong of the test, *i.e.* the policy underlying FMLA (discussed *infra*). That is, the *Cobb* Court's use of "equally important" did not indicate that the presence or absence of the re-bid contract was an equally important *factor* – or even necessarily relevant – to the first prong (such that the elaborated factors could be outweighed), but rather that a finding of successor liability also vindicated the *equally important* policy goals underpinning the FMLA. Thus, prong one of the analysis favors a finding that Bartech is a successor in interest to DGE.

In evaluating the equities affecting the employer – the second prong – the district court focused on the fact that the change in employers was neither tactical nor likely to recur in reaching its conclusion that there is "no corresponding need to impose upon Bartech the burden of absorbing DGE's existing FMLA liabilities." *Grace*, 2006 U.S. Dist. LEXIS at *19. But the following language from *Cobb* shows that Bartech's motivations have little bearing on the issue: "Successor liability under the FMLA . . . *derives from labor law, not corporate law*." 452 F.3d at 551-552 (emphasis added).[18] The defendant also points to several other factors that it urges this Court to consider. Bartech argues that a contrary finding on the successor-in-interest issue may discourage employers from taking over the contracts of failing companies. *See* Final Br. of Defendant (Bartech) at 33-34 (citing, *inter alia*, *Steinbach v. Hubbard*, 51 F.3d 843, 847 (9th Cir. 1995) (discussing risk of imposing "statutory liabilities" on suitor companies)). But the burdens imposed by FMLA do not appear as significant as those discussed in *Hubbard*, where the Ninth Circuit expressed concern about numerous "meretricious claims" rooted in employment discrimination that were brought as the company approached bankruptcy. *Hubbard*, 51 F.3d at 846-47 (quoting *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 750-51 (7th Cir. 1985)). Moreover, this Court implicitly rejected the defendant's argument in *Cobb*, when we found a successor in interest in a similar factual scenario.

The defendant also contends that a decision refusing to apply successor liability leaves the plaintiff in no worse a position than if DGE had gone out of business without Bartech taking over the contract. *Grace*, 2006 U.S. Dist. LEXIS at *19 n.7 (stating that her "qualifying time for FMLA would most certainly have reset under that scenario"). It is unclear, however, how this observation is relevant, for Bartech did take over the contract, thus implicating the successor-in-interest inquiry. Additionally, the defendant contends that unlike other labor law contexts where successor liability has been found, there is no concern here that the new company might "benefit" from the policies of the prior employer (*e.g.* unfair labor practices such a prior employer's discrimination). *See* Br. of Defendant (Bartech) at 34-35 (citing *Golden State Bottling Co., Inc. v. NLRB*, 414 U.S. 168 (1973)). According to the defendant, an adverse holding on the successor-in-interest issue will compel the

---

[18]Judge Clay, writing for this Court in *Cobb*, discussed in great detail the history of successor liability in the labor law context. *See Cobb*, 452 F.3d at 551-55. In one case that *Cobb* cited, a unanimous Supreme Court writing in 1973 stated that while "the general rule of corporate liability" required a transfer of assets or merger, the "perimeters of the *labor-law doctrine of successorship* [] *have not been so narrowly confined*." *Golden State Bottling Company v. NLRB*, 414 U.S. 168, 182 n.5 (1973) (emphasis added). The Supreme Court noted, moreover, that the "public policies underlying the [successorship] doctrine will be served by its broad application." *Id.*

company to hire outside workers in the future instead of taking over existing contract workers such as Grace. But we believe that the National Employment Lawyers Association provide an appropriate response to these concerns in their *amicus curiae* brief (supporting the plaintiff), noting that Bartech has "benefitted from the stability and continuity created by the retention of long-term employees of its predecessor," a loaned employee who had worked for the same employer for eight years. Br. of Amicus Curiae. In pursuing the opportunity to take over the contract workers employed by DGE, Bartech benefitted from the existing employees' experience. Had Bartech instead chosen to service the account with its own employees (and USCAR agreed), many would have been eligible for FMLA leave (*i.e.* by meeting the 12 month qualification period); and had Bartech resorted to hiring new contract workers to replace Grace and her colleagues, thus delaying the process, USCAR may very well have rejected the company's bid to service the account.

Finally, the defendant urges us to overturn *Cobb*, or at the very least, to take into consideration the fact that there was no merger or transfer of assets in the instant case. However, we expressly addressed and rejected the defendant's argument in *Cobb* that a merger or transfer of assets was a precondition to successor liability, noting that the duty to grant reasonable medical leave is unrelated to the issue of whether the liability can be reflected in a company's purchase price (*i.e.* at the time of the merger or transfer). *Cobb*, 452 F.3d at 556. Moreover, this case does not implicate the type of situation where a merger or transfer might nevertheless be relevant to the analysis. *See id*. (noting that, as in *EEOC v. Vucitech*, 842 F.2d 936, 945 (7th Cir. 1988), the manner of the purchase might be relevant to whether "substantial continuity" existed).

Notably, the district court failed to discuss the third factor relevant to the equitable balancing – namely, the federal policy underlying the FMLA. The basic goals of the FMLA are "to entitle employees to take reasonable leave for medical reasons," 29 U.S.C. § 2601(b)(2), and to "balance the demands of the workplace with the needs of the family." 29 U.S.C. § 2601(b)(1). As the *Cobb* court noted, the requirement that the employee have worked for at least twelve months and for 1,250 hours during that time sought "to exclude temporary and seasonal workers from coverage*." Cobb,* 452 F.3d at 557 (citing H.R. Rep. No. 103-8(I), at 35 (1993)). Here, Grace satisfies the full-time requirement that underpins employee eligibility for FMLA leave. The FMLA's focus on the individual employee appears to warrant emphasis on the first prong of the equity analysis; conversely, other labor law issues implicating successor liability (*e.g.* collective bargaining obligations) more obviously implicate employees as a collective *vis-à-vis* their employer's interests, and, by extension, the second prong of the analysis.

Congress also sought to ensure that only large employers are subject to the FMLA's potentially "onerous requirement of keeping an unproductive employee on the payroll." *Engelhardt*, 472 F.3d at 6. Consequently, the legislation created a so-called "small employer" exception to the FMLA by limiting coverage to those employers with more than 50 employees. *See Douglas v. E.G. Baldwin & Assocs.*, 150 F.3d 604, 608 (6th Cir. 1998). According to the House Committee Report, the provision "recognizes the difficulties an employer may have in reassigning workers to geographically separate facilities." *Harbert v. HealthCare Servs. Group, Inc.*, 391 F.3d 1140, 1148 (10th Cir. 2004) (citing H.R. Rep. No. 102-135(I), at 37 (1991)). But in this case, Bartech clearly satisfies the numerosity prong and, by extension, Congress' concern that only large employers be required to provide FMLA leave. Therefore, the third prong of the equitable balancing – which the district court failed to consider – supports a finding that Bartech is a successor in interest to DGE.

In conclusion, we believe that the equities at issue in this case compel us to adhere to our well-reasoned decision in *Cobb* and find that Bartech is a successor in interest to DGE. Accordingly, Grace was an employee entitled to take 12 weeks of unpaid leave.

**VI.**

USCAR is a partnership of Ford, DaimlerChrysler and General Motors, each with thousands of employees, some of whom were loaned to USCAR from time to time, but USCAR contends that it is not an "employer" under any definition of FMLA because it has no employees on its payroll, and that it therefore cannot be liable for violating Grace's FMLA right to reinstatement. This argument appears to misinterpret the very definition of an "employer" for labor law purposes.

USCAR urges us to apply the "payroll method," in which a court examines how many employees are on a putative employer's payroll, to find that USCAR has no employees and thus cannot be an employer. *See Walters v. Metro Educ. Enters.*, 519 U.S. 202, 206-07 (1997) (describing the payroll method in the Title VII context); *Farmiloe v. Ford Motor Co.*, 277 F. Supp. 2d 778, 790 (N.D. Ohio 2001) (examining the defendant's payroll and finding that the employer failed to employ the requisite number of employees for Title VII purposes). However, the *Walters* Court proceeded to state that "the ultimate touchstone" for determining the number of employees was "whether an employer has *employment relationships*" with individuals. 519 U.S. at 211 (emphasis added). As discussed, *supra*, USCAR supervised Grace's day-to-day work, determined her salary and hours, and benefitted from her work. Thus, USCAR has an employment relationship with, *at the very least*, the five employees under contract with Bartech that it supervised and controlled as well as the managers and staff of USCAR.[19] *See* 29 C.F.R. § 825.106(d) ("[e]mployees jointly employed by two employers *must be counted by both employers*") (emphasis added); *cf. Magnusson v. Peak Tech. Servs., Inc.*, 808 F. Supp. 500, 510 (E.D. Va. 1992) (finding that in joint employment under Title VII, the greatest emphasis should be placed on the "extent of the employer's right to control the manner and means of the worker's performance").

Furthermore, the Department of Labor's regulations are clear that "a secondary employer is also responsible for compliance with the prohibited acts provisions with respect to its temporary/leased employees, *whether or not the secondary employer is covered by FMLA*." 29 C.F.R. § 825.106 (emphasis added). The agency has issued a clarification letter indicating that a secondary employer like USCAR is liable for violations of the FMLA "regardless of the number of employees employed." Br. of Plaintiff at 46 (quoting 60 Fed. Reg. 2180, 2183). Thus, regardless of the number of employees under its control, USCAR is a secondary employer under the FMLA.

**VII.**

The plaintiff alleges in her complaint that the defendants violated Title VII's prohibition against gender discrimination by (1) taking adverse action against the plaintiff, and (2) creating a hostile working environment towards women. The district court found that USCAR was not an "employer" under Title VII and thus limited its analysis to whether Bartech, as a joint employer, had sufficient notice of USCAR's allegedly discriminatory conduct. *See Grace*, 2006 U.S. Dist. LEXIS at *25-26. Even assuming, *arguendo*, that both defendants are "employers" under the statute and that Bartech had sufficient notice of Grace's complaint, we find that the defendants are entitled to summary judgment on the merits of the Title VII claims.

---

[19]Because we hold that USCAR is liable under the FMLA as a secondary employer, we pretermit the question of whether USCAR employs more than 50 employees and is directly liable under the FMLA. However, the fact that USCAR's annual budget is over $200 million and oversees hundreds of engineers involved in its projects suggests that it would meet this numerosity requirement. And this does not take into account the thousands of employees each of the three corporate partners in this joint venture themselves employ.

*(A) Gender discrimination claim*

The plaintiff first argues that the defendants violated Title VII by firing her and replacing her with a less qualified male employee. JA 15. To make out a prima facie case of gender discrimination Grace must show that: (1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably. *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004). Notably, "a court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case." *Wexler v. White's Fine Furniture*, 317 F.3d 564, 574 (6th Cir. 2003). If the plaintiff meets this initial burden of establishing a prima facie case, then the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the plaintiff's discharge. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Once the defendant has done so, the burden reverts to the plaintiff to show that the defendant's alleged reason is a mere pretext for discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). At all times, the burden of persuasion remains with the plaintiff. *Id.*

Grace has alleged a prima facie case of gender discrimination. She is a member of a protected group and an employer's decision to discharge an employee is a classic example of adverse employment action. *See Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 n.2 (6th Cir. 2007). It is undisputed that she was also qualified for her position. Although the defendants claim that Spolarich did not "replace" her because he was a part-time employee, we believe, as discussed *supra*, that Grace has met this element by furnishing evidence indicating that Spolarich performed essentially the same duties as Grace and also was compensated at a total rate similar to Grace prior to her leave.

Even assuming that Grace made out a prima facie case, however, the defendants argue that the decision to terminate Grace resulted from USCAR's decision to restructure its business and to outsource its IT positions. A plaintiff can "refute the legitimate, nondiscriminatory reason that an employer offers to justify an adverse employment action 'by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" *Wexler*, 317 F.3d at 576 (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). In order to prove pretext, therefore, the plaintiff must "introduce admissible evidence to show 'that the proffered reason was not the true reason for the employment decision' and that [*discriminatory*] *animus* was the true motivation driving the employer's determination." *Barnes v. United Parcel Serv.*, 366 F. Supp. 2d 612, 616 (W.D. Tenn. 2005) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 508 (1993)) (emphasis added).

An examination of whether the plaintiff has fulfilled her burden and established that the defendant's justification was pretextual requires us to distinguish the FMLA and Title VII claims. In support of her FMLA claim, discussed *supra*, the plaintiff offers considerable evidence that her pending return to her job prompted the defendants to restructure the IT business; that is, that the restructuring was merely a pretext for not restoring her to her former position. As to the claim of gender discrimination, the plaintiff simply alleges she was replaced "by a male that [sic] was less qualified." JA 949-50. This fact goes to her ability to make a prima facie gender discrimination claim, but it does not help her overcome her burden of showing that "discriminatory animus" motivated the defendants decision to replace her with a male employee. Unlike the FMLA claim, where Grace need only demonstrate that her *prior position* – or equivalent – *still existed* at the time she returned from unpaid leave, the Title VII claim requires her to make some showing that gender informed the decision to hire a male to replace her. Grace is unable to do so. She does not allege, for example, that USCAR specifically requested a male employee or that either USCAR or Bartech had a policy of replacing female employees with male employees. Rather, the facts suggest that

USCAR merely requested a replacement employee, regardless of gender. Because Grace does not offer any evidence that gender played a role in USCAR and Bartech's decision to replace her with a male employee, her claim cannot survive either defendant's motion for summary judgment on the merits of her gender discrimination claim.

*(B) Hostile work environment claim*

Grace also alleges a hostile work environment claim under Title VII. To survive a motion for summary judgment, Grace must establish that (1) she is a member of a protected class (female), (2) she was subjected to harassment, either through words or actions, based on sex, (3) the harassment had the effect of unreasonably interfering with her work performance and creating an objectively intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability on the part of the employer. *See Fleenor v. Hewitt Soap Co.*, 81 F.3d 48, 49 (6th Cir. 1996). The harassment must meet both an objective and a subjective test, "in other words, the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim." *Randolph v. Ohio Dep't of Youth Svcs.*, 453 F.3d 724, 733 (6th Cir. 2006). For the following reasons, we find that Grace has failed to establish the third prong of a prima facie case – namely, the inference of a hostile or offensive work environment.

The Supreme Court has provided a non-exhaustive list of factors to consider when deciding whether a hostile work environment exists including: "the frequency of the discriminatory conduct; its severity; *whether it is physically threatening or humiliating, or a mere offensive utterance*; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993) (emphasis added). Further, courts must determine whether the "workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment .'" *Id.* at 21 (internal citations omitted).

The plaintiff attempts to support her hostile work environment claim with the following evidence of Flaherty's behavior: (1) according to a colleague, she referred to Grace as a "dancing girl" or a "call girl," JA 803 (Cunningham deposition), (2) that Flaherty ignored Grace, except to comment on her appearance, JA 962 (Grace deposition), (3) that Shimon, upon hearing the complaints, stated "Let's just try to make it through the next few months [until Flaherty's known end date at USCAR]," JA 1122, 1131, and (4) caused another employee, Jennie Sweet, to quit. JA 720. It is unclear whether the incidents listed in (2)-(4) demonstrate that the alleged abuse resulted from Grace's status as a female. See *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir. 2000) ("[M]any of the alleged harassing acts cannot be considered in the hostile environment analysis because [the plaintiff] has not shown that the alleged harassment was based upon his status as a male.").

Assuming, *arguendo*, that the evidence is permissible, these allegations suggest that Flaherty's actions – at least on occasion – made Grace and other women in the office feel uncomfortable, even to the point that they spoke with Shimon about the possibility of leaving their jobs. But "the work environment as a whole must be considered rather than a focus on individual acts of alleged hostility." *Bowman*, 220 F.3d at 463. In *Williams v. GMC*, for example, we found that the plaintiff had raised a genuine issue of material fact as to the existence of a hostile work environment where a male employee repeatedly uttered phrases such as "Hey, slut" and "I'm sick and tired of these [expletive] women" and also made inappropriate physical advances. *Williams v. GMC*, 187 F.3d 553, 563 (6th Cir. 1999). In the instant case, however, the occasional comments, which may have been "offensive utterances," do not rise to the level required by the Supreme Court's definition of a hostile work environment in *Harris* (*i.e.* "physically threatening or humiliating"). 510 U.S. at 23. To hold otherwise would risk changing Title VII into a "code of workplace civility," a result we have previously rejected. *See, e.g., EEOC v. Harbert-Yeargin, Inc.*,

266 F.3d 498, 507 (6th Cir. 2001) (citing *Holman v. Indiana*, 211 F.3d 399, 404 (7th Cir. 2000)). Consequently, the defendants are entitled to summary judgment on the merits of the Title VII hostile work environment claim.

## VIII.

Because the district court dismissed all of the plaintiff's federal claims, it concluded that it did not have subject matter jurisdiction over the related state-law claim. *Grace*, 2006 U.S. Dist. LEXIS at *27 ("[Subject matter jurisdiction no longer exists for the state-law claim, and it must also be dismissed as a matter of law."). The district court was incorrect in saying that the state-law claim had to be dismissed as a matter of law. *Musson Theatrical v. Federal Express Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996) (There is no "categorical rule that the pretrial dismissal of a federal claim bars a court from deciding remaining state law claims."). But it is likely that the court would have nevertheless declined to exercise supplemental jurisdiction, a decision we review for an abuse of discretion. *Clemens Trust v. Morgan Stanley DW, Inc.*, 485 F.3d 840, 853 (6th Cir. 2007).

The court did not indicate that the claim was dismissed with prejudice on the merits such that the plaintiff could not re-file her complaint in state court. She is free to do so. Furthermore, because we reverse and remand the plaintiff's FMLA claim, the district court may choose to exercise supplemental jurisdiction over the ELCRA claim.

## IX.

For the foregoing reasons, we AFFIRM the judgment of the district court with respect to the plaintiff's Title VII claims, REVERSE with respect to the plaintiff's FMLA claim, and REMAND the case for further proceedings consistent with this opinion.