NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0728n.06
Filed: November 24, 2008

No. 07-6234

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| DEBRA L. VAUGHN, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| v. | ) | DISTRICT OF KENTUCKY |
| | ) | |
| LOUISVILLE WATER COMPANY; JOHN L. | ) | O P I N I O N |
| HUBER, Louisville Water Company; GREGORY C. | ) | |
| HEITZMAN, Vice-President, Louisville Water | ) | |
| Company; ROBERT K. MILLER, Vice-President, | ) | |
| Louisville Water Company/Board of Water Works; | ) | |
| MICHAEL STURGEON, Human Resources, | ) | |
| Louisville Water Company; RONALD D. EILER, | ) | |
| Louisville Water Company, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE:     KENNEDY, SUTTON, and McKEAGUE, Circuit Judges.

**McKEAGUE, Circuit Judge.**  Plaintiff Debra Vaughn appeals the district court's grant of

summary judgment in favor of her former employer, defendant Louisville Water Company ("LWC"),

on her claims of disparate treatment, hostile work environment, and retaliation under Title VII of the

Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*  For the reasons stated below, we

**AFFIRM** the decision of the district court.

I

A.  Factual Background

In February 1992, LWC, a municipal water utility, hired Vaughn as a Right of Way Administrator. She was responsible for acquiring easements and obtaining permits for LWC to install water facilities. Because Vaughn's position was "exempt," she was not entitled to overtime.

In 1996, LWC combined the Right of Way and Survey departments into one "process." A position was created for the supervisor, or "process owner," of the new Survey and Easements department. The position required the applicant to have a surveyor license. Although Vaughn wanted to apply for the position, she did not have a surveyor license. Ron Eiler, the head of the Survey department, applied for and received the position. He was the only employee to apply. Vaughn alleges that the process owner job description included the surveyor license requirement specifically to exclude her from applying for the position. She apparently told her supervisors, Jim Asseff and Greg Heitzman, that she did not believe a surveyor license was necessary to perform the job. According to Vaughn, the two female employees who were later hired into the same process owner position did not possess a surveyor license.

Nonetheless, Vaughn claims she was told not to worry about the process owner position. Asseff and Heitzman apparently told her that her job responsibilities would not change. They also apparently said that Eiler's process owner position was not at a higher pay grade, nor was it a promotion for Eiler. Vaughn admits that her job responsibilities did not change after Eiler became process owner. She remained at a grade 9 pay level and retained the same job title. In February 2002, however, Vaughn claims she became concerned that she was doing the work of a process owner without the title or salary. She claims she expressed her concerns to Eiler, who

condescendingly told her to "just keep doing things the way you are and everything will be just fine." Vaughn Aff. ¶ 29, J.A. at 169.

In May 2002, Vaughn alleges she reviewed LWC's employment records and discovered that Eiler was being paid at a grade 10 pay level—one level higher than her. At that time, she also claims she discovered that LWC paid overtime to some male employees in positions, such as hers, that were exempt. She claims the male employees were either exempt and paid more than her, or non-exempt and paid overtime.

Vaughn also alleges that when she and Eiler interviewed applicants for available positions, Eiler would only hire males. Specifically, in 1997, she claims Eiler told a female applicant that he would not hire a female for a survey position. She also claims that Eiler hired white applicants over African Americans. In 2001, Eiler apparently made a statement regarding the file of a property owner whose last name was Bigot. Vaughn claims he said, "I'm a bigot, my wife's a bigot too!" Vaughn Aff. ¶ 23, J.A. at 168. According to Vaughn, she was offended and insulted by this statement.

After Eiler's "bigot" comment, Vaughn alleges she complained to Jim Wehrle, LWC's Vice President of Human Resources. Eiler apparently accused her of "character assassination" and was "irate" that she did not address her problems with him first. Vaughn Aff. ¶ 24, J.A. at 168. As a result of her complaints, Vaughn participated in a series of meetings with Eiler. She claims these meetings made Eiler angry and resentful toward her. In the first meeting, she alleges Eiler was "stone faced" and "slammed his hands on the table" at her. Vaughn Aff. ¶ 26, J.A. at 168.

Vaughn also alleges that a known "good old boy" atmosphere persisted at LWC. Vaughn Aff. ¶ 69, J.A. at 179. According to Vaughn, females were treated as lower class employees and were subjected to "open mockery and verbal abuse" by Eiler and other male employees. *Id.* She claims Eiler treated females in a "hostile, harassing way with an air of intimidation and discrimination." Vaughn Aff. ¶ 40, J.A. at 171. She also claims that Eiler frequently made negative, hostile remarks to Diana Cecil, another LWC employee.[1] She claims that in early 2002, Eiler began monitoring his female employees more closely than the male employees. Vaughn also alleges that Greg Heitzman, LWC's Vice President, made disparaging remarks about Laura Douglas, LWC's corporate counsel, in meetings Vaughn attended. Vaughn claims Heitzman never made these types of comments about male employees. She alleges that she was typically the only female who attended these meetings, and that all of the other males would laugh in response to Heitzman's comments.

In May 2002, Vaughn discussed her concerns with Rhonda Plunkett, LWC's Director of Cultural Diversity. John Anderson, the Employee Relations Manager, subsequently began an investigation into Eiler's conduct. In June 2002, while the investigation was sill ongoing, Vaughn claims she was leaving the office when Eiler walked out behind her, drove his car behind her car, and "just sat there and stared [her] down." Vaughn Aff. ¶ 47, J.A. at 173. In July 2002, at a retirement party for one of the company's secretaries, Vaughn claims Eiler spent the entire time staring at Vaughn, Cecil, and another female employee "in a very intimidating manner." Vaughn

---

[1]Cecil also filed a lawsuit against LWC, alleging disparate treatment, hostile work environment, and retaliation. *See Cecil v. Louisville Water Co.*, No. 3:03CV-540-S, 2007 WL 2746667 (W.D. Ky. Sept. 18, 2007). Cecil's appeal from the district court's grant of summary judgment in favor of LWC is also before this court.

- 4 -

Aff. ¶ 50, J.A. at 174. After the party, Vaughn claims she met with Greg Heitzman to discuss her concerns. Heitzman apparently indicated he would consider all options and "ultimately turn it over to God." Vaughn Aff. ¶ 51, J.A. at 174. At some point, Heitzman also apparently told Vaughn that she would not be receiving or submitting her work directly through him anymore. Throughout Anderson's investigation of Eiler, Vaughn also claims the male employees turned against her and the other female employees who had complained. She claims they "put up every road block possible" and eliminated the females from contact with consultants, which made it difficult for them to complete their work. Vaughn Aff. ¶ 52, J.A. at 174.

On July 26, 2002, Vaughn's doctor placed her on short term disability leave, as a result of depression, anxiety, and stress.

In early September 2002, Anderson completed his investigation of Eiler and cited him with a code of conduct violation.[2] He referred to Eiler's "inappropriate and unnecessary comments and statements that leave a 'perception' of unacceptable biases towards certain individuals and/or groups of people." J.A. at 240. A few days later, Eiler was removed from his position and later transferred to a resource coordinator position, apparently due to a reorganization of the Right of Way department.

After being informed of Eiler's transfer, and a few days before she was scheduled to return to work, Vaughn claims she discussed her concerns about Eiler with her supervisor, Edwin Chestnut. She apparently told Chestnut that she was afraid of Eiler and wanted to make sure that Eiler would

---

[2]Section 1.1 of the LWC Employee Code of Conduct and Performance Policy provides that employees shall "[m]aintain quality and performance standards."

be relocated before she returned. Chestnut discussed Vaughn's concerns with Heitzman, who apparently indicated that Eiler would not be relocated unless Vaughn presented a doctor's note. Vaughn did obtain a doctor's note extending her short term disability leave for a few days. She returned to work on October 3, 2002. When she came to work that day, Vaughn claims Eiler "was standing directly in front of my cubicle, forcing me to walk past him and very confrontational at a time when almost no one was in the building." Vaughn Aff. ¶ 55, J.A. at 176. Eiler remained in the same work location as Vaughn until November 2002. Even after he relocated, Vaughn claims Eiler periodically visited her floor for no apparent business purpose.

After she returned to work, Vaughn claims her job title was changed in retaliation for her complaints. She was designated as a "coordinator," a non-management position, instead of an "administrator," a management position. As a result of her new title, Vaughn alleges that she was ineligible for the company's Leadership Institute training. Without such training, Vaughn claims she was denied access to information about LWC's operations, which prevented her from obtaining promotions.

In October 2002, Vaughn also claims she received a negative performance evaluation from her new process owner, Cindy Kowalski.

On December 12, 2002, Vaughn filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging sex discrimination and retaliation under Title VII.

Vaughn again took short term disability leave on February 3, 2003. She was scheduled to return to work in late April, but she claims she could not return to the adverse atmosphere. She was again placed on short term disability leave until September 8, 2003. Vaughn did not return to work

on September 8, however. She claims she was physically incapable of returning because of the problems that remained unaddressed at LWC.

LWC discharged Vaughn on May 10, 2004. The company informed her that she had failed to return to work in September 2003, had exhausted all of her leave options, and had offered no medical documentation for her failure to return.

Also on May 10, 2004, Vaughn filed a complaint of discrimination with the Department of Labor, Office of Federal Contract Compliance Programs ("OFCCP"). The OFCCP notified LWC of the complaint and began an investigation.

## B. Procedural History

After receiving a right to sue letter from the EEOC, Vaughn timely commenced this action in the United States District Court for the Western District of Kentucky.[3] She asserted claims of gender discrimination, hostile work environment, and retaliation. On two occasions thereafter, LWC's Chief Executive Officer, John Huber, sent an email to all LWC employees informing them of the discrimination lawsuits filed against the company.

After completion of discovery, and after Vaughn had been discharged, LWC moved for summary judgment on all claims. Before the district court ruled on the motion, the OFCCP issued a Notification of Results of Investigation ("NORI") stating that it had found sufficient evidence to conclude that sexual harassment had occurred and a hostile work environment existed at LWC. The district court permitted Vaughn to supplement the record with the NORI, holding that it was

---

[3]Upon receipt of a right to sue letter from the EEOC, a claimant has 90 days in which to initiate civil proceedings. 42 U.S.C. § 2000e-5(f)(1).

admissible as an investigative report of a government agency under Rule 803(8)(C) of the Federal Rules of Evidence. It then granted LWC's summary judgment motion in full. Vaughn timely appealed.

**II**

**A. Standard of Review and Summary Judgment Standard**

We review a district court's grant of summary judgment *de novo*. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389 (6th Cir. 2008). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A "genuine" dispute is one that would permit a reasonable jury to return a verdict in favor of the nonmoving party. *Henderson v. Walled Lake Consol. Schs.*, 469 F.3d 479, 487 (6th Cir. 2006). A fact is "material" only if its resolution could affect the outcome of the litigation under the applicable law. *Id.* At the summary judgment stage, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007).

**B. Statute of Limitations**

LWC first argues that any incidents of discrimination, hostile work environment, or retaliation that occurred before February 15, 2002—300 days before Vaughn filed her EEOC charge—are barred by Title VII's statute of limitations. To recover under Title VII, a plaintiff must first timely file a charge with the EEOC. *Amini v. Oberlin Coll.*, 259 F.3d 493, 498 (6th Cir. 2001). Both parties agree that Vaughn had 300 days to file her EEOC charge. *See* 42 U.S.C. § 2000e-

5(e)(1) (providing that in a state or locality where an agency is authorized to grant or seek relief, an individual must file a charge with that state or local agency, and must file any charge with the EEOC 300 days after the alleged unlawful employment practice occurred).

"A discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002). A pay-setting decision is a discrete act and the period for filing an EEOC charge begins when the act occurs. *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 127 S. Ct. 2162, 2165 (2007). Accordingly, Vaughn's claims that she did not receive the Survey and Easements process owner position in 1996, was paid less than Eiler as a result of his promotion, and did not receive the same overtime pay as other exempt male employees, are time-barred because they occurred more than 300 days before Vaughn filed her EEOC charge.

Vaughn alleges that these claims are not barred because she did not discover the discrimination regarding the promotion, pay, and overtime until June 2002, when she reviewed employee job descriptions. The Supreme Court has "previously declined to address whether Title VII suits are amenable to a discovery rule." *Id.* at 2177 n.10. Even were we to agree that the discovery rule should apply in Title VII cases, this would not be the case in which to announce it.[4] Vaughn reasonably should have discovered any discrimination after she did not receive the position in 1996. Although she claims she was told that Eiler had not received a promotion, it is simply incomprehensible to believe that she had no idea Eiler had received a higher, supervisory position—particularly given that she reported to him, *see* J.A. at 80-81, 290, 292-95. A diligent

---

[4]Accordingly, we express no opinion today as to the applicability of the discovery rule in Title VII cases.

employee would have discovered discrimination or a disparity in pay at that point. Because the discovery rule would not save Vaughn's untimely claims, the district court properly granted summary judgment to LWC.[5]

## C. Disparate Treatment

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Aside from her untimely claims, Vaughn alleges that LWC discriminated against her because of her sex when it altered her job title and, as a result, denied her Leadership Institute training.[6]

A plaintiff may establish discrimination by either direct or circumstantial evidence. *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006). Direct evidence is "evidence that proves the existence of a fact without requiring any inferences." *Id.* It is evidence which, "if

---

[5]Even if her claims are timely, Vaughn cannot make out a prima facie case of discrimination based on LWC's failure to promote her to the process owner position. To establish a prima facie case of discrimination based on a failure to promote, a plaintiff must show that 1) she is a member of a protected class; 2) she applied and was qualified for the promotion; 3) she was considered for and denied the promotion; and 4) other employees of similar qualifications who were not members of the protected class received promotions. *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006). Vaughn neither was qualified nor applied for the position, and therefore cannot make out a prima facie case. She has also failed to present any evidence that the requirements of the position were drafted in a discriminatory way so as to prevent her from applying.

[6]Vaughn also argued before the district court that her work was outsourced and that she did not receive the position of Business System Owner of Supplying Customer Service in 2001. Because she has not challenged either of these actions on appeal, we decline to address them.

believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921 (6th Cir. 1999). Vaughn argues that the evidence of Eiler's specific bias against females, the company's own reference to such a "perceived bias," and the OFCCP's findings constitute direct evidence of discrimination. At best, however, the company's finding only acknowledges that Eiler "periodically" made inappropriate comments that left a "'perception' of unacceptable biases towards certain individuals," J.A. at 240; it does not concede that an objectively discriminatory environment actually existed for Vaughn individually. And although the NORI may acknowledge a discriminatory environment at LWC generally, its findings do not specifically refer to Vaughn and it defers any individual findings to the federal court. J.A. at 297. Because this evidence does not require us to conclude that Vaughn was subjected to discrimination, it is not direct evidence.

In the absence of direct evidence, we analyze discrimination claims under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Vincent v. Brewer Co.*, 514 F.3d 489, 494 (6th Cir. 2007). Where, as here, a case is at the summary judgment stage, "the plaintiff must submit evidence from which a reasonable jury could conclude both that she has established a prima facie case of discrimination and that the defendant's legitimate, nondiscriminatory reason for its action, if any, is pretext for unlawful discrimination." *Id.*; *see also McDonnell Douglas*, 411 U.S. at 802-04. To establish a prima facie case of disparate treatment, a plaintiff must show that 1) she is a member of a protected class; 2) she was subjected to an adverse employment decision; 3) she was qualified for the position; and 4) she was replaced by a person

outside the protected class, or treated differently than similarly situated non-protected employees. *Vincent*, 514 F.3d at 494.

Vaughn has failed to establish that the change in her job title from administrator to coordinator in 2002, and her resulting inability to attend Leadership Institute training, resulted in any adverse employment action. An adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Baxter Healthcare Corp.*, 533 F.3d at 402 (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)). It must be "more disruptive than a mere inconvenience or alteration of job responsibilities." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 594 (6th Cir. 2007). Here, the terms and conditions of Vaughn's employment did not change after the change in her job title. She admitted that her duties, salary, and benefits remained the same. Vaughn Dep. 194-95, J.A. at 522. And although "a deprivation of increased compensation as the result of a failure to train constitutes an adverse employment action," *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 710 (6th Cir. 2007), Vaughn has failed to present any evidence that she was passed up for promotions because of her inability to attend the Leadership Institute training. She only alleges that the training "would have . . . allow[ed] me to be able to be promoted to another position . . . when and if something else opened up." Vaughn Dep. 192, J.A. at 521. But her own conclusory assertions as to the value of the training and her inability to receive promotions are insufficient to survive summary judgment. *See Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008).

Even were we to assume, for the sake of argument, that Vaughn has established a prima facie case, LWC has nonetheless offered legitimate, nondiscriminatory reasons for its actions. The employer need only articulate a nondiscriminatory rationale; it need not prove it. *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996). Here, LWC contends that Vaughn's new job title was simply a re-tooling of job descriptions based on a change in management.

Further, Vaughn cannot demonstrate that LWC's legitimate reasons for its actions were in fact only a pretext for intentional discrimination. To do so, the plaintiff must show that the employer's proffered reasons 1) had no basis in fact, 2) did not actually motivate the challenged conduct, or 3) were insufficient to motivate the challenged conduct. *Grace v. USCAR & Bartech Tech. Servs., LLC*, 521 F.3d 655, 677 (6th Cir. 2008); *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 589 (6th Cir. 2002). Vaughn does not address the issue of pretext on appeal. She has not offered any proof that LWC's reason lacks a factual basis, was insufficient to motivate its actions, or was anything but the product of sound and honest business judgment. She has also failed to offer evidence that LWC's actions had anything to do with her gender. Ultimately, her theory of gender discrimination is based solely on her unsupported speculations of an anti-female bias at LWC. That is not enough to establish pretext or to survive summary judgment. *See Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 623 (6th Cir. 2003). Accordingly, we affirm the grant of summary judgment in favor of LWC with respect to Vaughn's disparate treatment claim.

**D. Hostile Work Environment**

Title VII also prohibits conduct which is "sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Meritor Sav.*

*Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To establish a prima facie case of hostile work environment, a plaintiff must prove that: 1) she is a member of a protected class; 2) she was subjected to unwelcome harassment; 3) the harassment was based upon her protected status; 4) the harassment unreasonably interfered with her work performance by creating a hostile, offensive, or intimidating work environment; and 5) there is a basis for employer liability. *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 455 (6th Cir. 2008).

LWC first argues that any alleged harassment had nothing to do with Vaughn's sex. Title VII protects any unequal treatment that would not have occurred but for the employee's sex, even if the conduct is non-sexual. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999). Here, however, many of the incidents Vaughn seeks to include in her hostile environment claim occurred after she reported Eiler for his "bigot" comment. For example, she claims that Eiler "stared her down" in the parking lot and at the retirement party specifically because of her complaints of discrimination. This suggests that—if anything—much of Eiler's conduct was retaliatory, not gender-based. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790-91 (6th Cir. 2000) (refusing to include alleged retaliatory conduct in the hostile work environment calculus because plaintiff did not suggest the conduct was committed "because of sex").

Even if some the alleged harassment was based on Vaughn's sex, it still must be severe and pervasive to be actionable. In evaluating the severity and pervasiveness of workplace harassment, we consider the totality of the circumstances. *See Williams*, 187 F.3d at 562; *see also Harris*, 510 U.S. at 23. Relevant circumstances include the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. Viewed as a whole, the environment must be both objectively and subjectively offensive, hostile, and abusive. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to" a hostile work environment. *Id.* at 788. Rather, "conduct must be extreme to amount to a change in the terms and conditions of employment." *Id.* We have consistently rejected any invitation to convert Title VII into a "code of workplace civility." *Grace*, 521 F.3d at 679.

Viewing Vaughn's allegations as a whole, we agree with the district court that the incidents were not so severe and pervasive that a reasonable person would find her work environment hostile and abusive. Eiler's actions and comments appear to have been isolated incidents that occurred over a period of ten years. *See Morris*, 201 F.3d at 790 (holding that several dirty jokes, a verbal sexual advance, a one-time reference to plaintiff as "Hot Lips," and comments about plaintiff's state of dress were not sufficiently severe and pervasive). Moreover, Vaughn has not presented evidence indicating that any of the alleged incidents of harassment interfered with her work performance. While Eiler's presence on Vaughn's floor after he was reassigned in 2002 may have been uncomfortable, he was relocated within a reasonable time. Vaughn even testified that during that time she was not prevented from performing her job duties. Finally, Vaughn's general allegations of "open mockery and verbal abuse" and the "hostile" and "harassing" environment that was "pervasive" are not enough to survive summary judgment. *See Arendale*, 519 F.3d at 605 (holding that plaintiff's conclusory assertions of continuous "racial harassment" were insufficient).

Vaughn attempts to bolster her hostile work environment claim with the OFCCP's general findings of a hostile work environment and the company's own findings of Eiler's "perceived bias" against females. LWC contends that the OFCCP's findings are inadmissible under Rule 803(8)(C) because the sources of information and the circumstances of the investigation indicate a lack of trustworthiness. Yet, even assuming the NORI is admissible as a public record, *see Chandler v. Roudebush*, 425 U.S. 840, 863 n.39 (1976), it does not specifically address whether the environment was hostile—both subjectively and objectively—for Vaughn individually. And it specifically "defer[s] any findings as to Ms. Vaughn's individual claims to the results of the U.S. District Court's opinion." J.A. at 298. Further, the company's own finding of a "'perception' of unacceptable biases" by Eiler, creating "an adversarial environment especially among female employees," J.A. at 240-41, indicates that LWC may have acknowledged the subjective perceptions of some of its female employees, but it does not admit that an objectively hostile, severe, and pervasive atmosphere existed for Vaughn individually. Even considering this evidence, Vaughn has not satisfied her burden of showing a hostile work environment, and summary judgment for LWC was therefore proper.

**E. Retaliation**

Under Title VII, it is an unlawful employment practice "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Vaughn claims eight incidents of retaliation: 1) denying her a promotion to process owner after Eiler was reassigned; 2) changing her job title; 3) terminating her health benefits under the

Consolidated Omnibus Budget Reconciliation Act ("COBRA") in May 2004;[7] 4) Eiler's actions in the parking lot and other intimidating behavior;  5) the overall threatening work environment;  6) the negative evaluation in October 2002;  7) Huber's company-wide emails regarding Vaughn's lawsuit in September 2003;  and 8) her May 2004 discharge.

In the absence of direct evidence, we review Vaughn's retaliation claims under the *McDonnell Douglas* framework. *Weigel v. Baptist Hosp.*, 302 F.3d 367, 381 (6th Cir. 2002).  To establish a prima facie case of retaliation, a plaintiff must show that: 1) she engaged in activity protected by Title VII;  2) the employer knew of her exercise of protected rights;  3) the employer took a materially adverse action against the plaintiff or subjected her to severe and pervasive retaliatory harassment;  and 4) there was a causal connection between the protected activity and the adverse action. *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003).

Many of the retaliatory acts Vaughn alleges are insufficient to constitute materially adverse actions.  A materially adverse action in the retaliation context is not limited to those actions that affect the terms and conditions of employment, or even acts that occur in the workplace;  it is sufficient to show that the action would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 68

---

[7]The district court refused to consider Vaughn's claim regarding her COBRA benefits because she raised it for the first time in her response to LWC's motion for summary judgment. Although that likely amounted to a waiver of the argument and a failure to preserve it for appeal, *see Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008), Vaughn's claim of retaliation based on the denial of benefits fails on the merits as well.

(2006). A materially adverse action does not include trivial harms, such as "petty slights or minor annoyances that often take place at work and that all employees experience." *Id.*

Vaughn first argues that it was retaliatory for the company to deny her a promotion to process owner after Eiler was reassigned in October 2002. She claims she was never considered for this position, but there is no evidence that she applied for it. Not receiving a promotion for which one did not apply would not dissuade a reasonable worker from engaging in protected conduct, and accordingly does not constitute a materially adverse action.

Several of Vaughn's other allegedly retaliatory acts do not rise to the level of a materially adverse action. "[M]arkedly lower performance-evaluation scores that significantly impact an employee's wages or professional advancement" may be materially adverse actions. *Halfacre v. Home Depot, U.S.A., Inc.*, 221 Fed. Appx. 424, 433 (6th Cir. 2007); *see also James v. Metro. Gov. of Nashville*, 243 Fed. Appx. 74, 79 (6th Cir. 2007). But Vaughn has not shown that the negative performance evaluation she received in October 2002 significantly affected her salary or professional advancement. Further, Huber's company-wide emails simply informed LWC employees of the lawsuit and emphasized the company's commitment to diversity; they would not have dissuaded a reasonable worker from filing a charge. Eiler's presence on Vaughn's floor for one month may have been uncomfortable, but he was eventually relocated. And the few times he expressed his anger to Vaughn were isolated incidents. Vaughn has not presented enough evidence to show that these incidents were so important as to dissuade a reasonable worker from making or supporting a charge of discrimination. Nor has she shown that, even viewing them as a whole, she was subjected to severe and pervasive retaliatory harassment. *See Morris*, 201 F.3d at 793 (finding retaliatory

harassment where plaintiff's supervisor visited her department over fifteen times, called her over thirty times, followed her home from work, and threw nails on her driveway).

Even if she can show that the change in her job title, denial of COBRA benefits, and discharge resulted in materially adverse actions, Vaughn must produce evidence of a causal nexus between those actions and her protected activity. Temporal proximity is usually not enough to show causation. *Nguyen v. City of Cleveland*, 229 F.3d 559, 566-67 (6th Cir. 2000); *Cooper v. City of N. Olmstead*, 795 F.2d 1265, 1272 (6th Cir. 1986). "Where an adverse employment action occurs very close in time after an employer learns of a protected activity," however, temporal proximity may be enough. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). But "where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.* In *Mickey*, the plaintiff was found to have satisfied his burden of proving causation where his employer fired him the very day it learned of his EEOC charge. *Id.* at 526.

We are not convinced that the temporal proximity between several of the allegedly adverse actions and any of Vaughn's protected conduct is sufficient to give rise to an inference of causation. Vaughn received a letter regarding the termination of her COBRA benefits on May 3, 2004, seven days *before* she filed the OFCCP complaint. J.A. at 249. She was also discharged before she filed the OFCCP complaint, because she referred to her discharge in the complaint itself. J.A. at 231. In addition, the discharge and denial of benefits occurred approximately one and a half years after Vaughn filed her EEOC charge and approximately eight months after she filed suit in federal court.

In contrast to the same-day firing of the employee in *Mickey*, these lengthy gaps are insufficient, on their own, to create a reasonable inference of causation. *See Hamilton v. Starcom Mediavest Group, Inc.*, 522 F.3d 623, 629-30 (6th Cir. 2008) (holding that a nine-month gap, standing alone, is insufficient). Vaughn's job title was changed after she returned to work in October 2002, approximately four months after she had complained to LWC management. It is a closer call whether this four-month gap is sufficient to show causation after *Mickey*. *See Cooper*, 795 F.2d at 1272 (holding four months insufficient prior to *Mickey*); *Goller v. Ohio Dept. of Rehab. & Corr.*, 285 Fed. Appx. 250, 257 (6th Cir. 2008) (holding two-month gap sufficient after *Mickey*). We need not make that call today, however, because even if Vaughn's is one of those few cases in which temporal proximity is enough, LWC has offered legitimate, non-retaliatory reasons for its actions and Vaughn is unable to show that they are pretextual.

Assuming without deciding, then, that Vaughn has established a prima facie case of retaliation, LWC has produced legitimate business reasons for its actions. LWC claims the change in Vaughn's job title was simply a re-tooling of job descriptions based on a change in management. The company discharged her because she did not return to work after she exhausted all of her medical leave and vacation time. Finally, it terminated her COBRA benefits because she stopped sending her premium payments to LWC.

And ultimately, as with her claims of disparate treatment, Vaughn cannot disprove LWC's proffered reasons or present evidence that they were insufficient to motivate the company's actions. "[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason" for taking an adverse employment action, "the employee cannot establish that the reason is pretextual simply

because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). "An employer has an honest belief in its rationale 'when it reasonably relied on the particularized facts that were before it at the time the decision was made.'" *Caterpillar Fin. Servs. Corp.*, 496 F.3d at 599 (quoting *Majewski*, 274 F.3d at 1117). The key inquiry is whether the employer made a "reasonably informed and considered decision," not whether the decisional process was optimal or "left no stone unturned." *Id.* at 598-99 (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)).

Here, Vaughn has failed to submit evidence showing that the allegedly retaliatory actions were anything but legitimate and honest business decisions. As to the denial of COBRA benefits, Vaughn admitted that "I cannot prove that my checks were sent and received (and should have sent them with return receipt coverage)." J.A. at 250. Regarding her discharge, Vaughn claims LWC did not notify her that she would be discharged if she did not return to work in September 2003. But she admits she knew she was expected to return to work on that date. Whether, as she argued, she could physically return to work is irrelevant. Based on all of the facts before LWC, the company had a reasonable basis and an honestly held belief that Vaughn's absence from work was grounds for discharge.

Moreover, Vaughn has failed to present evidence—aside from unsupported, conclusory assertions—indicating that retaliation was the true reason for LWC's actions. We conclude, therefore, that LWC was entitled to summary judgment on Vaughn's retaliation claim.

**III**

Because Vaughn has failed to establish a genuine issue of material fact on her claims of disparate treatment, hostile work environment, and retaliation, we **AFFIRM** the district court's grant of summary judgment in favor of LWC.